## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| Paul Smith, derivatively on behalf of Neogen Corporation, | ) ) ) | Case No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| James C. Borel, John Adent, Thierry Bernard, William T. Boehm, Jeffrey Capello, Ronald D. Green Aashima Gupta, Raphael A. Rodriguez, James P. Tobin, Darci L. Vetter, Andrea Wainer, Catherine Woteki, and David Naemura, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| Neogen Corporation, a Michigan Corporation, | ) ) | |
| Nominal Defendant. | ) ) ) ) ) ) ) | |

Plaintiff Paul Smith ("Plaintiff"), derivatively on behalf of Neogen Corporation ("Neogen" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Operating Engineers Construction Industry and Miscellaneous Pension Fund v. Neogen Corporation et al.* (W.D. Michigan Case 1:25-cv-00802) (the "Securities Action"); (iii) corporate governance

documents available on the Company's website; and (iv) other publicly available information.

## NATURE OF THE ACTION

1.    This is a stockholder derivative action brought by Plaintiff, a stockholder of Neogen, on behalf of the Company against the Defendants.  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least January 5, 2023, to June 3, 2025. During that time the Defendants (as defined herein) caused or allowed Neogen to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2.    Neogen is a food safety company that manufactures and markets products and services dedicated to food and animal safety. Neogen operates through two main business segments: Food Safety and Animal Safety. The Food Safety segment provides diagnostic test kits and other products to test for dangerous substances in human and animal food. The Animal Safety segment develops and supplies pharmaceuticals and medical instruments in the veterinary market.

3.    In December 2021, it was announced that Neogen would merge with the Food Safety Division of the 3M Company ("3M"). The deal closed in September 2022. Upon closing, Neogen commenced what would become a lengthy and complicated integration process. During the Class Period, Defendants issued a series of materially false and misleading statements which led investors to believe that the integration was progressing much better than it actually was. In addition, even when the Company was forced to reveal that certain "inefficiencies" arose as a result of the integration, Defendants downplayed them and assured investors that they were fully aware and committed to resolving them quickly.

4.    Investors slowly learned the truth through a series of disclosures beginning on January 10, 2025. That day, the Company revealed, among other things, that GAAP net income in

the second quarter was significantly negative due to a $461 million non-cash goodwill impairment charge related to the 3M acquisition. Neogen also updated its full year outlook, cutting its fiscal year 2025 ("FY25") revenue and EBITDA guidance. In addition, the Company revealed that, as of November 30, 2024, the Company had material weaknesses in its internal control over financial reporting. On this news, the price of the Company's common stock declined 5% to close at $12.36 per share.

5.     One financial quarter later, on April 9, 2025, Neogen announced that quarterly revenue fell 3.4% to $221 million, in part, due to integration issues. Neogen again cut its FY25 revenue and EBITDA outlook and noted that capital expenditures were expected to be $100 million as a result of lowered adjusted EBITDA and a pull-forward of integration-related capital expenditures into FY25. Moreover, Neogen revealed that the Company's CEO would be stepping down. On this news, the price of the Company's common stock plummeted 28% to close at $5.02 per share, on a volume spike of 47 million shares.

6.     Finally, on June 4, 2025, Neogen shocked investors when it revealed that it expected "EBITDA margin to probably be around the high-teens" which represented a considerable drop from the previous quarter's profit margin of 22%. On this news, the price of the Company's common stock fell an additional 17%, to close at $4.96 per share. Overall, during the Class Period, from the Company's August 15, 2023, high of $23.84 per share through its June 4, 2025 closing price of $4.96 per share, Neogen's stock price dropped an astonishing $18.88 per share, or 79%, erasing more than $4 billion of the Company's market capitalization.

7.     Through this action, Plaintiffs seek to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

## PARTIES

### A.    Plaintiff

8.    Plaintiff is a current shareholder of Neogen and has continuously held Neogen stock during all times relevant hereto, and is committed to retaining Neogen shares through the pendency of this action to preserve his standing.  Plaintiff will adequately and fairly represent the interests of Neogen and its shareholders in enforcing its rights.

### B.    Nominal Defendant

9.    Nominal Defendant Neogen is a corporation organized and existing under the laws of the State of Michigan. The Company's principal executive offices are located at 620 Lesher Pl, Lansing, MI 48912. Neogen common stock trades on the NASDAQ under the ticker symbol "NEOG."

### C.    Individual Defendants

10.    Defendant John Adent has served as President and CEOof the Company since 2017 and as a director of the Company since 2018.

11.    Defendant James C. Borel has been a director of the Company since 2016 and is the Board Chair.

12.    Defendant Thierry Bernard has been a director of the Company since 2024.

13.    Defendant William T. Boehm has been a director of the Company since 2011.

14.    Defendant Jeffrey Capello has been a director of the Company since 2022.

15.    Defendant Ronald D. Green has been a director of the Company since 2014.

16.    Defendant Aashima Gupta has been a director of the Company since 2022.

17.    Defendant James P. Tobin was a director of the Company until May 31, 2025.

18.    Defendant Raphael Rodriguez has been a director of the Company since 2020.

19.     Defendant Darci L. Vetter was a director of the Company until the day after the 2023 Annual Meeting of Neogen.

20.     Defendant Andrea Wainer has been a director of the Company since 2025.

21.     Defendant Catherine Wotek has been a director of the Company since 2020.

22.     Defendants Adent, Borel, Bernard, Boehm, Capello, Green, Gupta, Rodriguez, Tobin, Vetter, Wainer, and Wotek are herein referred to as "Director Defendants."

23.     Defendant David Naemura has served as CFO of the Company since 2022.

24.     Defendants Adent and Naemura are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this court under 28 U.S.C. § 1391, because Neogen is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

A.      **Company Background**

29.      Neogen and its subsidiaries develop, manufacture, and market a diverse line of products and services dedicated to food and animal safety. The Company's Food Safety segment consists primarily of diagnostic test kits and complementary products sold to food producers and processors to detect dangerous or unintended substances in human food and animal feed, such as foodborne pathogens, spoilage organisms, food allergens, pesticide residues, and general sanitation concerns. The majority of the test kits are consumables, single-use, culture, immunoassay and DNA detection products that rely on proprietary antibodies and RNA and DNA testing methodologies to produce rapid test results. Neogen's Animal Safety segment develops, manufactures, markets, and distributes a variety of products including veterinary instruments, pharmaceuticals, parasiticides, and disinfectants, as well as genomics testing services for the worldwide animal safety market.

30.      Neogen historically has pursued growth through acquisitions. On September 1, 2022, Neogen, 3M, and Neogen Food Safety Corporation, a subsidiary created to carve out 3M's Food Safety Division, closed on a $5.3 billion transaction combining 3M's Food Safety Division with Neogen. Upon closing, Neogen Food Safety Corporation became a wholly owned subsidiary of Neogen. Analysts hailed the combination as a "great decision", but Defendants hid from investors the true nature and extent of the challenges Neogen faced while integrating 3M with its business.

31.      Throughout the Class Period, Defendants issued a series of false and misleading statements which led investors to believe that the integration was progressing smoothly when the opposite was true. As detailed below, at the beginning of the Class Period, Defendants touted that the integration process was "off to a great start" and that the Company "delivered solid core growth

in both of our segments and, notably, a level of profitability well ahead of where the company was prior to the acquisition." (Emphasis added).

32.    Later, Defendants highlighted that Neogen "continue[s] to make good progress on the integration activities" and has "seen significant growth in the sales pipeline over the last few months and are excited about the potential ahead." In addition, while the Company admitted that certain "inefficiencies" arose as a result of the integration process, Defendants downplayed them assuring investors, "we have our arms around the key issues and are fully committed to resolving them in the near future." (Emphasis added).

33.    Moreover, in late-2024, Defendants touted the "huge strides [Neogen had made] in 2024" which allowed the Company to now "refocus that energy and time from integration efforts to efficiency and growth efforts, which is what I'm really excited to see the team do."

34.    These statements, as detailed below, were false and misleading as Defendants misrepresented the status of the integration and failed to disclose the negative impact of significant integration issues on the financial health of Neogen.

**B.    Neogen's False and Misleading Statements**

35.    From at least January 5, 2023, through June 3, 2025 (the "Relevant Period"). Neogen and its executive officers made materially false and misleading statements about (a) the status of the integration with 3M; and (b) the impact of significant integration issues on the financial health of Neogen.

36.    On January 5, 2023, Neogen announced its second quarter of fiscal year 2023 ("2Q23") financial results, its first (full) quarter as a combined Company with 3M. During the earnings call later that day, CEO Adent commented on the transaction stating, in relevant part:

> We're pleased to be with you today to provide the first view of the company's performance since the completion of the Food Safety acquisition

from 3M. We've delivered solid core growth in both of our segments and, notably, a level of profitability well ahead of where the company was prior to the acquisition. The former 3M Food Safety business is a great business and highly complementary and we're excited about what we've seen in the first four months of our ownership.

Clearly, we have still got a number of things to do, and we're early days in the integration, but we're off to a great start and we have numerous work streams fully underway across the organization to integrate our systems, products, processes and people.

* * * * *

Neogen is a resilient business, having grown now in 122 of the last 128 quarters, due largely to the consumable nature of our products, which play critical roles throughout the food supply chain. After the acquisition of the Food Safety division of 3M, approximately 95% of our total revenues come from consumable products, which we believe positions us to continue to grow despite the current level of macro uncertainty.

(Emphasis added).

37.     Adent further noted that Neogen had worked hard "to identify and prioritize the highest potential revenue and synergy opportunities." Following the release of the 2Q23 results, an analyst at William Blair commented, "we were encouraged by a solid first quarter out of the gate that gives an early glimpse of the company's earnings potential."

38.     The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements were misleading because the integration with 3M was not in fact off to a "great start." The integration was plagued with inefficiencies from day one that Defendants knew would necessitate a goodwill impairment and would impact capital expenditures, revenues, and EBITDA margins. Defendants touted revenue potential and synergy opportunities while failing to disclose complications immediately encountered and the issues with integrating a deal of this magnitude, especially with respect to manufacturing, shipping, production overlap, and internal controls.

39.    On March 30, 2023, Neogen reported its 3Q23 financial results. During the earnings call, CEO Adent provided an update on the integration stating, in pertinent part:

> [W]e continue to make good progress on the integration activities. Commercially, our teams have been combined and cross trained and we are navigating the tighter market conditions focused on a prioritized set of opportunities globally. We've seen significant growth in the sales pipeline over the last few months and are excited about the potential ahead.

(Emphasis added).

40.    CFO Naemura also commented on Neogen's financial performance stating, "[a]djust[ed] EBITDA was $51 million representing growth of 106% from the prior year quarter driven by the merger with the former 3M Food Safety business."

41.    These statements were materially false and misleading because Neogen was not making "good progress on the integration activities with 3M." To the contrary, the integration was plagued with inefficiencies from the outset—inefficiencies Defendants knew would trigger a goodwill impairment and negatively impact capital expenditures, revenues, and EBITDA margins. Defendants touted growth in the sales pipeline and short-term EBITDA increases while failing to disclose complications immediately encountered and the issues with integrating a deal of this magnitude, especially with respect to manufacturing, shipping, production overlap, and internal controls.

42.    As the Relevant Period progressed, Neogen continued to provide investors with positive updates on the 3M integration. For example, on January 9, 2024, Neogen announced its 2Q24 financial results. During the earnings call, Defendants stated, in relevant part:

> This is an exciting time at Neogen as we're approaching several near-term milestones on the journey of integrating the former 3M Food Safety business. Following the launch of our new ERP system in September, we made further progress by initiating the exit of several transition service agreements that we have with 3M, while continuing to ramp up our internal capabilities. On the manufacturing front, we also successfully completed

the first phase of the relocation of the former 3M pathogen and sample
handling product lines into Neogen facilities. The final relocation of the
sample handling production we now expect to complete in Q4, but
otherwise remain on track to exit all transition agreements outside of
Petrifilm manufacturing by the end of the third quarter.

(Emphasis added).

43.     These statements were materially false and misleading because Neogen was not

successfully eliminating overlap created by the combination of the two food safety divisions,

including significant overlap in manufacturing facilities. Contrary to Defendants' representations,

the integration was immediately plagued with inefficiencies that Defendants knew would

necessitate a goodwill impairment and would impact capital expenditures, revenues, and EBITDA

margins. Defendants touted the purported "milestones" and "progress" on its integration efforts

while failing to disclose complications immediately encountered and the issues with integrating a

deal of this magnitude, especially with respect to manufacturing, shipping, production overlap, and

internal controls.

44.     On April 9, 2024, Neogen announced its 3Q24 financial results. During the earnings

call, the Company provided further updates regarding integration:

We completed the relocation of the former 3M pathogen detection product
line and are now manufacturing in one of our Lansing facilities.

We also completed the first-two of our four phase relocation of a former 3M
sample handling product line to one of our facilities in Lexington. With the
remaining two phases expected to be completed by the end of the fiscal year
and production beginning in Q1.

(Emphasis added).

45.     Notwithstanding the purported progress, Neogen noted the existence of certain

"inefficiencies" that had developed as a result of the integration. Yet, the Company largely

downplayed these inefficiencies and reassured investors, "we have our arms around the key issues

and are fully committed to resolving them in the near future." Additionally, with respect to capital

expenditures, Neogen noted, "[t]he integration process we've made has also come a substantial

investment in working capital or CapEx this year, which we expect will reduce significantly in

2025." (Emphasis added).

46.    These statements were materially false and misleading because Neogen did not

"have its arms around key issues" with respect to the integration and was not successfully

eliminating overlap created by the combination of the two food safety divisions, including

significant overlap in manufacturing facilities. In reality, the integration was plagued with

inefficiencies from day one that Defendants knew would necessitate a goodwill impairment and

negatively impact capital expenditures, revenues, and EBITDA margins. Defendants further had

no reasonable basis for stating that capital expenditures would lessen "significantly in 2025" in

light of the integration challenges already facing the Company.

> On July 30, 2024, Neogen announced its 4Q24 and FY24 financial results.
> During the earnings call, the Company highlighted additional positive facts
> about the integration: After crossing multiple significant integration
> milestones in the third quarter, progress continued on multiple fronts in the
> fourth quarter.
>
> * * * * *
>
> With respect to capital expenditures, we are anticipating a sizable decrease
> as we move past the peak integration spend of fiscal '24. For fiscal '25, we
> expect capital expenditures of approximately $85 million with
> approximately $55 million, specifically related to integration items. The last
> couple of quarters have seen a tremendous amount of integration progress
> as we extricated ourselves from the services previously provided by our
> transition partner. This progress came with the inefficiencies in our
> distribution center that we discussed and have now resolved. … Outside of
> the new facility we're building, the 3M food safety operations have now
> been combined with Neogen and we're able to shift a significant portion of
> our operational focus towards driving improvements in these combined
> operations.

(Emphasis added).

47.    That same day, the Company issued FY25 revenue guidance of $925 million to $955 million and adjusted EBITDA guidance to $215 million to $235 million. The Company also expected capital expenditures of $85 million, including $55 million related to the integration.

48.    These statements were materially false and misleading because Neogen had not seen "a tremendous amount of integration progress" and the inefficiencies previously acknowledged were not "now resolved." To the contrary, Neogen continued to face worsening integration issues that Defendants knew would necessitate a goodwill impairment and would impact capital expenditures, revenues, and EBITDA margins. Defendants touted the purported "milestones" and "progress" with respect to their integration efforts while failing to disclose complications immediately encountered and the issues with integrating a deal of this magnitude, especially with respect to manufacturing, shipping, production overlap, and internal controls. Defendants further had no reasonable basis for predicting a "sizeable decrease" in capital expenditures in light of the integration challenges continuing to plague the Company.

49.    On October 10, 2024, Neogen announced its 1Q25 financial results. During the earnings call, Adent emphasized that Neogen had made "huge strides in 2024" and that the Company could now "refocus that energy and time from integration efforts to efficiency and growth efforts, which is what I'm really excited to see the team do."

50.    Adent's statement was false and misleading. As of October 20244, Neogen had not made "huge strides" in its integration of 3M and the Company was not in fact in a position to "refocus that energy and time integration efforts" to moving forward effectively and efficiently. As would soon be confirmed, the integration was not complete, and the Company remained unable to refocus its time and energy into moving forward and growing. At this time, Neogen continued

to be plagued with acquisition-related complications and inefficiencies, including with respect to manufacturing, shipping, production overlap, and internal controls.

      **C.**    **The Truth is Revealed**

    51.    On January 10, 2025, after many quarters of touring the success of its integration of 3M, Neogen announced its preliminary 2Q25 financial results. That day, the Company revealed, among other things, that GAAP net income in the quarter was significantly negative due to a $461 million non-cash goodwill impairment charge related to the 3M acquisition. Neogen also updated its full year outlook, cutting its FY25 revenue and EBITDA guidance. In addition, the Company concluded that, as of November 30, 2024, the Company had material weaknesses in its internal control over financial reporting.

    52.    An analyst at Guggenheim Securities commented: "The Bad: Revenue and EBITDA guidance was cut, integration frustrations persist, and a long road still remains for driving positive market share gains after losing customers." Similarly, an analyst at William Blair found the updates "somewhat surprising" and noted that "the stock is in the penalty box until management shows more durable execution in the coming quarters." On this news, the price of the Company's common stock declined $0.71 per share, or 5%, to close at $12.36 per share.

    53.    The truth was further revealed on April 9, 2025, when Neogen announced its 3Q25 financial results, reporting a loss of $11 million, or $0.05 per share, compared with a loss of $2 million, or $0.01 per share, a year earlier. Revenue fell 3.4% to $221 million which had been negatively impacted by integration issues. Neogen again cut its FY25 revenue and EBITDA outlook. The Company also noted that capital expenditures were expected to be $100 million as a result of lowered adjusted EBITDA and a "pull-forward of integration capex into fiscal 2025." Notably, Neogen also revealed that CEO Adent would be stepping down. On this news, the price

of the Company's common stock plummeted $2.02 per share, or 28%, to close at $5.02 per share, on a volume spike of 47 million shares.

54.     Finally, on June 4, 2025, Neogen shocked investors when it revealed that the Company expected "EBITDA margin to probably be around the high-teens" which represented a considerable drop from the previous quarter's profit margin of 22%. Neogen blamed the expected shortfall on "elevated inventory write-offs." On this news, the price of the Company's common stock declined $1.04 per share, or 17%, to close at $4.96 per share.

55.     From the Company's August 15, 2023, stock price high of $23.84 per share through its June 4, 2025 closing price of $4.96 per share, Neogen's stock price dropped an astonishing $18.88 per share, or 79%, erasing more than $4 billion of the Company's market capitalization.

**D.     Defendants' Misconduct Has and Continues to Harm the Company**

56.     As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

57.     Neogen's reputation and goodwill have also been damaged by the Defendants' misconduct.

**E.     Neogen Issues False and Misleading Proxy Statements**

58.     In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statements issued on September 18, 2023 (the "2023 Proxy") and the September 13, 2024 (the "2024 Proxy") (collectively, the "False Proxies"),

that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

59.    The Director Defendants drafted, approved, reviewed, and/or signed the False Proxies Proxy before they were filed with the SEC and disseminated to Neogen's stockholders. The Director Defendants negligently issued materially misleading statements in the Proxies. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxies allegations and related claims.

60.    In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company in the False Proxies. The 2023 proxy stated:

**Board Role in Risk Management**

The Board oversees the Company's risk management. This oversight is administered primarily through the Board's review and approval of the management business plan, including the projected opportunities and challenges facing the business, periodic review by the Board of business developments, strategic plans and implementation, liquidity and financial results, the Board's oversight of succession planning, capital spending and financing, the Audit Committee's oversight of the Company's internal controls over financial reporting and its discussions with management and the independent accountants regarding the quality and adequacy of internal controls and financial reporting (and related reports to the full Board), the Governance Committee's leadership in the evaluation of the Board and committees and its oversight of identified risk areas of the Company, and the Compensation Committee's review and approvals regarding executive officer compensation and its relationship to the Company's business plan, as well as its review of compensation plans generally and the related risks.

61.    Similarly, the 2024 Proxy stated:

**Board Role in Risk Management**

The Board oversees the Company's risk management. This oversight is administered primarily through the Board's review and approval of the management business plan. This includes the projected opportunities and challenges facing the business, periodic review by the Board of business developments, strategic plans and implementation, liquidity and financial results, the Board's oversight of succession planning, capital spending and financing. Committee review includes the Audit Committee's oversight of the Company's internal controls over financial reporting and its discussions with management and the independent accountants regarding the quality and adequacy of internal controls and financial reporting (and related reports to the full Board), the Governance Committee's leadership in the evaluation of the Board and committees and its oversight of identified risk areas of the Company, and the Compensation Committee's review and approvals regarding executive officer compensation and its relationship to the Company's business plan, as well as its review of compensation plans generally and the related risks.

62.     The False Proxies thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning (a) the status of the integration with 3M; and (b) the impact of significant integration issues on the financial health of Neogen.

63.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**F.     The Board Breached its Fiduciary Duties**

64.     As officers and/or directors of Neogen, the Defendants owed Neogen fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Neogen in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and

officers of Neogen, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

65.    Defendants, because of their positions of control and authority as directors and/or officers of Neogen, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Neogen's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

66.    To discharge their duties, the officers and directors of Neogen were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Neogen were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)    Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)    Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)    Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)    Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

67.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

68.     The Board's Audit Committee is tasked with overseeing Neogen's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Neogen's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include, as follows:

> The purpose of the Audit Committee (the Committee) is to assist the Board of Directors (the Board) of Neogen Corporation (the Company) in overseeing: (1) the integrity of the Company's financial statements, including its use and reporting of any non-GAAP measures, (2) the effectiveness of the Company's internal control over financial reporting, (3) the Company's compliance with laws and regulations to which it is subject, (4) the Independent Auditor's qualifications, independence and performance, and (5) the performance of the Company's Internal Auditors.

> The Committee's role includes a particular focus on the qualitative aspects of financial reporting to shareholders and on Company processes for the management of financial risk and for compliance with significant applicable legal, ethical and regulatory requirements. The role also includes coordination with other board committees and maintenance of strong, positive working relationships with management, Independent and Internal auditors, Legal Counsel and other Committee advisors.

69.     In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Boehm, Borel, Capello, and Tobin (until his resignation) (collectively, the Audit Defendants") conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

70.     In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's

financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

71.    The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Neogen.

## DERIVATIVE ALLEGATIONS

72.    Plaintiff brings this action derivatively in the right and for the benefit of Neogen to redress injuries suffered by Neogen as a direct result of the Director Defendants' breaches of fiduciary duty.  Neogen is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

73.    Plaintiff will adequately and fairly represent the interests of Neogen in enforcing and prosecuting the Company's rights.

74.    Plaintiff was a stockholder of Neogen at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Neogen stockholder.

## DEMAND FUTILITY ALLEGATIONS

75.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

76.    The Neogen Board currently has ten (10) members.

77.    Plaintiff has not made any demand on Neogen's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**A.    The Director Defendants Lack Independence Because They Face a Substantial Likelihood of Liability**

78.    As alleged above, the Director Defendants breached their fiduciary duties by negligently issuing the materially misleading False Proxies soliciting the reelection of themselves to the Board. Accordingly, the Director Defendants face a substantial likelihood of negligence liability for issuing the False Proxies and any demand upon these defendants is therefore futile.

79.    The Director Defendants face a substantial likelihood of liability for their individual misconduct. As alleged above, the Director Defendants breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described above. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

80.    In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Neogen.

81.     the Director Defendants making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Neogen to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to the Director Defendants.

**B.      The Officer Defendants are Not Independent**

82.     Defendant Adent is the President and CEO of Neogen. Defendant Adent received compensation of $7,221,352 in 2024. Defendant Adent depends on Neogen for his income. In addition, Neogen stated in the 2024 Proxy that Defendant Adent is not independent pursuant to SEC and NYSE rules.

83.     Defendant Naemura is the Company's CFO Neogen. Defendant Naemura received compensation of $4,810,651 in 2024. Defendant Naemura depends on Neogen for his income. In addition, Neogen stated in the 2024 Proxy that Defendant Naemura is not independent pursuant to SEC and NYSE rules.

**C.      The Audit Defendants are not Disinterested Because They Were Members of the Committee Responsible for Overseeing Financial Reporting**

84.     One of the Audit Committee's responsibilities is risk oversight. The Audit Committee was thus responsible for reviewing and approving Neogen's Forms 10-Q and 10-K filed during the Relevant Period. The Audit Defendants were members of the Audit Committee

during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, the Audit Defendants caused improper statements by the Company. Accordingly, the Audit Defendants breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

85.     Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

86.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

87.     Each of the Defendants owed and owes Neogen the highest obligations of loyalty, good faith, due care, and oversight.

88.     Each of the Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

89.     The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

90.     In addition, the Director Defendants further breached their fiduciary duties owed to Neogen by willfully or recklessly making and/or causing the Company to make false and

misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations concerning (a) the status of the integration with 3M; and (b) the impact of significant integration issues on the financial health of Neogen.

91.    The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

92.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

93.    As a direct and proximate result of the breaches of duty alleged herein, Neogen has sustained and will sustain significant damages.

94.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

95.    Plaintiff, on behalf of Neogen, has no adequate remedy at law.

## COUNT II
## Breach of Fiduciary Duty
## (Derivatively Against the Officer Defendants)

96.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

97.     The Officer Defendants are executive officers of the Company. As executive officers, The Officer Defendants owed and owe Neogen the highest obligations of loyalty, good faith, due care, oversight, and candor.

98.     The Officer Defendants breached their fiduciary duties owed to Neogen by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact concerning (a) the status of the integration with 3M; and (b) the impact of significant integration issues on the financial health of Neogen.

99.     The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

100.    As a direct and proximate result of the breaches of duty alleged herein, Neogen has sustained and will sustain significant damages.

101.    As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

102.    Plaintiff, on behalf of Neogen, has no adequate remedy at law.

## COUNT III
## Violation of Section 14(a) of the Exchange Act
## (Against The Director Defendants)

103.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

104.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

105.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the False Proxies. In the False Proxies, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

106.    The False Proxies, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Neogen misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

107.    Plaintiff, on behalf of Neogen, thereby seeks relief for damages inflicted upon the Company based upon the misleading False Proxies in connection with the improper reelection of the Director Defendants to the Board.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of

Neogen and that Plaintiff is a proper and adequate representative of the Company;

B.        Against all of the Defendants and in favor of Neogen for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.        Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.        Awarding Neogen restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.        Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.        Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 7, 2025

S/ Lane R. Zabawa
_____
Lane R. Zabawa (P79774)
Ventures Law Firm, PLLC
Attorney for Plaintiff/ Local Counsel
2991 Riverwoods Dr NE
Rockford, MI 49341
(734)790-3801
LZabawa@VenturesLawFirm.com

**ROWLEY LAW PLLC**
Shane T. Rowley, Esq.
Danielle Rowland Lindahl, Esq.
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
        drl@rowleylawpllc.com

## **VERIFICATION**

I, Paul Smith, am the named plaintiff in the foregoing derivative action. I have read the foregoing Verified Stockholder Derivative Complaint, know the contents thereof, and authorized its filing.  The contents alleged therein are true to my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.  I further declare that I am a current holder, and have been a holder, of Neogen Corporation common stock during the time period in which the wrongful conduct alleged and complained of occurred.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 6  day of August, 2025.

*Paul Smith*
Paul Smith (Aug 6, 2025 10:22:30 EDT)

Paul Smith